Page 24-3940, G. Pat Patterson, Ph.D. v. Kent State University, et al., Oral Argument, 15 minutes per side. Mr. Whittaker for the appellant. Good morning, Your Honors. Good morning, Counsel. My name is Justin Whittaker. I'm here this morning on behalf of the appellant, G. Pat Patterson, who is a tenured professor at Kent State University. The origin of this case is in Title VII on gender-based discrimination. It also involves a large component of First Amendment retaliation against a public employee by their employer. Dr. Patterson is the only out transgender tenured professor at Kent State. This matter below was dismissed on summary judgment. The Northern District of Ohio, as Judge Griffin observed, questions of fact generally line up as to if something's close. And we believe that, at worst in this case, there are a lot of close issues. However, the district court below only reached the issue in the prima facie case of whether or not there were adverse actions. The first error committed below was that the district court relied on the former materially adverse action standard employed by the Sixth Circuit and generally around the country, which the Supreme Court overruled in the Muldrow case around the same time that the parties were actually briefing summary judgment. But before the district court ruled on summary judgment, Muldrow unanimously reached a decision that Title VII doesn't require any showing of materiality or any other heightened harm. And again, the district court only reached the adverse action element of the prima facie case. So we don't have more than that from the district court to go on. But I take it the pretext was argued below. It was argued below. And the record is complete on that issue. Yes, sure. Yes, everything was argued below. The district court just didn't reach beyond the adverse action element. In addition to the majority's opinion in Muldrow, there's a concurring opinion by Justice Kavanaugh, which says that the majority in Muldrow didn't go far enough, that discrimination itself is the harm. We don't have to look to any other sort of harm to find an adverse action. And while that opinion, while Justice Kavanaugh's opinion was not the majority, it appears to be looked at favorably in the Sixth Circuit. In the Doe versus University of Kentucky case and the Blick case, it seems that the Sixth Circuit is coalescing around Justice Kavanaugh's opinion that discrimination itself is the harm. And there are district court cases around the country, most of them unreported, which are slowly lining up along those lines. It's not definitive, but it appears to be that Justice Kavanaugh's opinion is gaining some traction. There's also no, I don't think, any real argument that the reasoning in Muldrow doesn't also apply to discrimination cases in terms of disability discrimination cases, of which there's a- Can I ask you a question? So I understand there's the tenure transfer denial. Yes. There's the not being made the head of the center. Yes. And then below there was an argument about the credit reallocation of teaching time or whatever that was, the six credits or whatever. Yes, the revocation. I think you mentioned that in your appellate brief, but I didn't see much of an argument on it. Are you still pressing that as an adverse action? Yes, Your Honor. I think we addressed all of those in the primary brief and in the reply, that all of these actions- I didn't see a lot on that last one. There was the revocation of the credit of the teaching hour allocation. We call it the load lift. Maybe that's how- the teaching load lift that was revoked. It was granted and then revoked. We argue that all of those are adverse actions, even under the majority- even if we applied the materially adverse action standard, which we don't anymore, under Muldrow, those are all adverse actions because there was a negative impact on Dr. Patterson's employment and their ability to earn a living and the prestige of their position, their ability to have speaking engagements and publishing opportunities, which there's no dispute. Dr. Mazzi testified below one of Kent State's employees that publishing is everything. The ability to publish is the most important thing to a professor, and those opportunities arise from the main campus and not in these regional campuses that Kent State maintains. And so- Does that mean that anybody who's at a regional campus is in some kind of adverse employment type situation? No. If I'm not at the main campus, it's clearly inferior, just per se. No, Your Honor. Dr. Patterson was hired at that campus, at the Tuscaroras campus, and there are opportunities to advance to the main campus, and those opportunities were offered to them and then removed, we believe, based- at least there's a question of fact based on- Where's the evidence that either one of those committees that voted to deny had any kind of gender discrimination? I just didn't see any evidence of that. Well, we can look on the indirect evidence standard. We have to look to what the reason given for the denial of at least the transfer to the main campus was a lack of collegiality. What does that mean? When I deposed the 30B6 representative for Kent State, there was no- it was admitted that there was no actual discussion of collegiality, but it was implied. Did they know about the emails at the time, the voting people? They seemed to have something to do with collegiality, wouldn't they? There was no discussion of that. No discussion of it, but- Well, I don't- there was no discussion of that by the 30B6 witness. There was no identification of those particular emails. Just the chronological sequence would be such that they would have been available for knowledge. Presumably, but the witness- Okay, I just want to make sure I've got the time sequence right, because there's a lot of time sequences. And under Muldraw, is every time you don't get something that would be an advancement, an adverse action, even if it is, in a sense, competitive or chosen by quality? I think the standard that will eventually settle is on Justice Kavanaugh's concurrence, which is if you make a decision based on any of the factors enumerated in Title VII, that's unlawful. That is discrimination, and discrimination itself is the harm. But that's not the law right now. I mean, I understand that's Justice Kavanaugh's view, but there were some other concurrences, as I recall, that kind of went the other way, right? I mean, the law is some harm, or whatever the majority says it is. The law is some harm. The circuit in the Doe v. Kentucky case quoted Justice Kavanaugh favorably, saying discrimination is the harm. So I would argue that, at least in the Sixth Circuit, under the Doe v. University of Kentucky case, it might have already adopted Justice Kavanaugh's concurrence. But the some harm standard, even if Dr. Patterson has to meet that, they've met that standard by virtue of the fact that they weren't appointed to the position. There's no dispute that they were qualified for the position. The justification given for not advancing them to that position is collegiality, and there's no dispute. Okay, but to Judge Boggs's question, you're saying that every time somebody is denied some kind of advancement or promotion, that would be an adverse action? If it's based on any of the prohibitive factors in Title VII. Isn't that sort of circular, that is, that you're saying you don't have to show any harm ab initio, you prove your discrimination, so that if the university opens up a prestigious professorship and 20 people applied for it, the 19 who don't get it all have met the harm standard. They've all suffered some harm, even under Muldrow, that would be true, but the gap needs to be bridged to Title VII if the decision was based on any of the factors listed in Title VII, race, gender, national origin, et cetera. And so then you would say that for each of them you have to present a whole dossier as to why they didn't get the job in order to show that it wasn't for a discriminatory reason. As for here, you say, well, they had a reason, but we get to attack that reason even if it's very general. Yes, Your Honor. I don't think Muldrow displaces the prima facie McDonnell-Douglas test. A plaintiff would still have to meet their prima facie test. Muldrow just liberalizes, for lack of a better word, the adverse action standard of the test. So a plaintiff would still need to meet their prima facie burden, and the McDonnell-Douglas burden-shifting analysis would still apply. All Muldrow does is lighten the burden of adverse action. I see that I've run out of my time. I'm happy to entertain any questions. Otherwise, I would like to reserve five minutes for rebuttal. Very well. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Daniel Roderi on behalf of Applee Kent State University, Applee Mandy Monroe Stasek, and Applee Julie Mazey. And while I'm on the subject, I will like to point out at the beginning that Dr. Patterson has not appealed from the district court's dismissal of any of the claims that were pending against Dr. Mazey individually. So the affirmance of that portion of the opinion below should, in our view, be a ministerial act at this point. When it comes to the merits of Dr. Patterson's appeal from the district court's dismissal of their claims against the university and Dean Monroe Stasek, my friend on the other side raises some interesting points about Muldrow and how that opinion may shape the law in the years to come. Ultimately, I don't believe it's necessary for this court to address Muldrow on the Title VII claims that were dismissed by the district court. As Judge Nalbandian pointed out during my friend's argument on the other side, pretext was fully briefed below. The problem for Dr. Patterson is that pretext was not briefed here. Dr. Patterson, in their opening brief on appeal, made a cursory reference to their briefing in the district court on the issue of pretext. Other than that, Dr. Patterson did not develop any pretext argument in their opening brief to this court, and this court's precedents have been very clear that simply citing to the record below, citing to briefing below, is insufficient to preserve an issue on appeal. But why would they have to do that in their opening brief? They lost on adverse action, so they say, hey, we have a problem. The court applied the wrong adverse action test. They're the appellant, so the appellee says, oh, okay, well, we're not really going to defend the adverse action. We're going to argue pretext instead. And then in their reply brief, they say, well, your pretext argument is wrong. That's exactly the way it's supposed to roll out, isn't it? Well, I would say no, Your Honor, according to this court's opinion in Milzak, which was a very similar situation. It's a 2024 opinion of this court, published opinion, came out in the summer of 24, shortly after Muldrow was decided. And Milzak said the district court erred in not holding that the adverse actions at issue didn't meet the standard under Muldrow. However, we're still going to affirm the district court because the plaintiff, the appellant in that matter, had not briefed pretext in their opening brief on appeal and therefore had waived it. You're the one that's appealing the pretext or lack of the pretext ruling by the district court, are you not? No, we've never filed a notice of cross appeal. No, you don't have to file a notice of cross appeal because all you're doing is you're asking for the same judgment that was rendered below, which is a judgment in your favor. So the claim, these are alternative theories, basically. But the pretext, though, is your appeal. And because it is, I don't think the plaintiff has to respond. He doesn't know what you're going to appeal until you file your brief. Well, a couple of responses to that, Your Honor. One, when this court reviews a grant of summary judgment, it's reviewing that de novo. So any issue that was properly briefed to the district court is before this court. It's preserved anyway. Anyway, I don't think your forfeiture argument as to their opening brief has any merit. So let's talk about the merits of pretext. You did raise that below. The district court did not rule on it. The district court only ruled on the no adverse action. But tell us why that they did not sustain their burden of showing this was pretextual. I'd be happy to do that, Your Honor, with reference to the pretext arguments that Dr. Patterson did make for the first time in their reply brief on appeal. Yeah, that's what I'm asking you to do. And specifically when it comes to the first portion of the Title VII claim regarding the center and the committees that were working on the gender studies major, Dr. Patterson pointed to, I believe, four different comparators, Professor Barnes, Professor Stratcher, Professor Mazey, and Professor Odell Scott, and said each of these individuals was treated more favorably than Dr. Patterson because they were allowed to transfer into the center. First of all, that's not true. None of these individuals actually transferred into the center. They did transfer into the new school where the center was housed. The problem with Dr. Patterson's pretext argument there is that Dr. Patterson never even applied to transfer into the new school where the center was housed. So from our perspective, there's simply nothing to compare with respect to these alleged comparators. It's apples and oranges. And when it comes to the English department tenure transfer, which is the second half of Dr. Patterson's Title VII discrimination claim, they cite to three other professors who did move from regional campuses to the Kent campus, and I'll note that two of those three are also members of a protected class based on sexual orientation. One, Professor Cunningham, identifies as lesbian. The other professor, I'll point out his name, Professor, forget his, one of the other professors identified as bisexual. And with respect to all three of them, the problem was that each professor who transferred into the Kent campus before Dr. Patterson did so to fill an existing academic need. And the undisputed testimony in the record is that Dr. Patterson was not bringing, there was no need for Dr. Patterson to fill. One of the concerns raised by the committees who voted on this is that Dr. Patterson wants to teach specific courses that we don't offer in the English department. We have no plans to offer. When Professor Cunningham and the others did transfer into the English department previously, it was to fulfill a specific need. Also, I'll note that there was no evidence in the record below that any of the comparators Dr. Patterson identified on the English department tenure transfer issue had engaged in similar conduct when it came to the committee's concerns regarding collegiality, abandonment of service. Was collegiality part of the decision? What does the record show about whether the committee members knew about the tweets or emails or whatever it is? Professor Tammy Clule, who was the university's 30B6 designee, as Mr. Whitaker pointed out, when asked about this, talked about how she, during that committee meeting, brought to light a situation where she had personal experience working with Dr. Patterson on a prior committee assignment that she believed reflected uncollegial behavior by Dr. Patterson. And she spoke at length in her 30B6 deposition about her concerns and that she shared those with the committee. That was the collegiality aspect, but that wasn't the only part of it because the committees were also aware that just prior to seeking to transfer their tenure to the Kent campus, Dr. Patterson had summarily abandoned all of their service commitments at the university. And that was something that bore on the narrow inquiry of scholarship, teaching, and service that one of the committees had to undertake. Additionally, there was the concern among other English department faculty members, the legitimate non-discriminatory concern that if we accept a lateral tenure transfer at this time when we don't have an existing need to fill, we may not be able to hire an outside candidate in the event we do have a need to fill a year from now or two years from now. So there were multiple concerns raised by the committee members. It wasn't simply the issue regarding collegiality that Dr. Kluhl brought to light. Were there actual, who was deposed that was part of the decision-making? Sure. There were several professors who were deposed. Dr. Takayoshi was a member of the committee that was deposed. And there were two committees, right? Yes, there was the RTP and the FAC committee. And there was some overlapping membership in those committees, but Dr. Takayoshi was deposed. Dr. Trogdon, who strongly supported Dr. Patterson's candidacy to transfer tenure, was deposed. And he testified unequivocally that in his view, none of these decisions had anything to do with Dr. Patterson's sex, sexual orientation, gender, or any other protected status under the law. I would like in my remaining time to address some of the other claims that are at issue because Dr. Patterson has appealed not only from the dismissal of the Title VII discrimination claim, but from the district court's dismissal of the Title VII retaliation claim. On that claim, there is simply no evidence that Dr. Patterson engaged in legally protected activity by specifically protesting actual or perceived discrimination based on a protected status. When Dr. Patterson was asked about this at deposition, they initially, and this is at pages 1202 and 1203 of the record, sort of hedged and said, well, I sort of brought it up to the dean, and then I responded by saying, well, did you specifically complain that you believed you were the victim of discrimination or retaliation against state? And Dr. Patterson responded by saying no. And that's borne out by the documents in the record as well. If the court wants to look at, I think, one of the most recent communications in time to when the dean made the decision to rescind this load lift or this credit load reallocation, it was an email from Dr. Patterson to the dean on July 14th of 2021. It's in the record as document 69-11. Dr. Patterson wrote to the dean and said, quote, the only equity issue I'm interested in discussing is an academic one. They were concerned that the WGS major wasn't getting the same treatment as other academic disciplines. Complaining about a disparity in academic disciplines is not protected activity under Title VII. And because Dr. Patterson can't make out a prima facie case of retaliation, we believe the district court's dismissal of that claim should be affirmed, even if on alternate grounds. Moving on to the Rehabilitation Act claim where Dr. Patterson alleged that they were perceived as disabled, I believe the precedent from across the country, including from this court, is very clear that off-the-cuff remarks by a non-supervisory co-worker that allude to mental health issues is not sufficient to show that the employer, the decision maker, actually considered an employee to be disabled. Moreover, and I think more fundamentally, the only actual adverse action that's pled in connection with the Rehabilitation Act claim is Dr. Patterson's allegation that they were denied the ability to participate in the center. Dr. Patterson's brief on appeal concedes that that is not true. At page 26 of their brief, when you look at the pages at the bottom, or page 40 if you're looking at the ECF stamp at the top of their brief, Dr. Patterson argues that they were, quote, and now on appeal it's become, well, we were relegated to participation. They can't have it both ways, and I believe that that concession operates to essentially dispose of the Rehabilitation Act claim. Finally, Dr. Patterson has appealed from the district court's dismissal of their First Amendment retaliation claim against Dean Monroe Stasek only. Dr. Patterson has not appealed from the dismissal of that claim as against the university or, as I mentioned earlier, against Dr. Mazey. Again, I think that claim can be resolved on very narrow, very simple grounds. Dr. Patterson specifically alleged, as the district court found, two adverse actions in connection with their First Amendment claim. First is that they were excluded from participation in the center. As I've explained in connection with the Rehabilitation Act claim, Dr. Patterson concedes that that simply is not true. They also alleged, in connection with their First Amendment claim, that the dean retaliated against them by conspiring with members of the English Department, RTP, and FAC committees to deny their tenure transfer. Dr. Patterson was specifically asked about that at deposition, and Dr. Patterson conceded that they had no evidence that the dean had conspired with anyone on either committee to deny their tenure transfer. That is at pages 1936 and 37 of the record. So based on Dr. Patterson's concessions regarding the absence of adverse action, again, looking at the ones that were specifically pled at pages 740 and 741 of the record in their Second Amendment complaint, they concede that those things simply did not happen. But if the court is inclined to look further and delve into the merits of the First Amendment retaliation claim, the only speech that's really at issue in this case is the speech that the dean specifically cited to in her declaration that was filed with the district court. The dean put images of those tweets in her declaration. They're at pages 4205 and 4206 of the record. I'll note that although Dr. Patterson has made attempts on appeal to suggest that they tweeted on other things at other times, there's no evidence in the record, certainly no citation to any evidence in the record, that the dean considered any other tweets when making her decisions in this case beyond the ones that the dean has specifically cited to. Those tweets fundamentally take issue with Dr. Patterson's. I guess this was my earlier question, though. Are those tweets also considered by the committee? Did they consider it? No. I don't believe there's been any testimony that the committee members considered those specific tweets. When they talked about collegiality, as Dr. Kuhl testified, they were referring to Dr. Patterson's prior behavior on other committee assignments. They weren't looking at those tweets specifically. It's really because, again, the claims here are somewhat bifurcated. I thought there were some of those tweets, or at least, am I wrong, is there some mention of the school or something that could touch on a matter of public concern, like how the school is run or how a department is run? Would you agree? I think there are complaints about how the school is run and how the department is run, but those complaints are directed at Dr. Patterson's fundamentally academic disagreement with who should be in charge of these committees based on their level of subject matter expertise. So one of the recurring phrases in these tweets is, although the cis-het white ladies with zero content expertise think they're in a better position to run these committees than I am, I'm the only one who is a transgender scholar. I'm the one who should be running the committees. The cases from across the country that we've surveyed in our brief are very clear that complaining about another faculty member's lack of expertise or litigating departmental controversies in the public's eye does not amount to a matter of public concern. And Dr. Patterson's speech follows that mold in this case. And even if the court were to hold that any of Dr. Patterson's tweets did rise to the level of public concern, we believe that Dr. Patterson has failed to meet their burden on qualified immunity, which was raised below, preserved below, raised again here. They had the burden to come forward with one or more cases that were at least similar to the events in this case to show that the law was clearly established. They failed to do so. And I see my time has expired. Unless there are any other questions from the panel, we would ask that the judgment of the district court be affirmed, even if on alternate grounds. All right. Thank you very much.  Thank you, Your Honors. I would just like to first I want to address the First Amendment issue that my friend on the other side raised. Dean Monroe Stasek produced a stack of tweets that she had copied and preserved because she thought she might need them later, was her testimony. The bulk of those tweets discussing discrimination, discrimination based on gender. No specific examples pointed at Kent State University. All the tweets were anonymous. Kent State's not mentioned. Dr. Patterson's employers aren't mentioned. Nothing about Kent State specifically is mentioned. There's no dispute about that. There's also no dispute that in the context of the tweets that the dean cherry-picked, she decided that the ones that don't talk about discrimination were the ones that upset her rather than in the context of all of the tweets, which the cases say that the court must look in the context of all of the speech rather than the cherry-picked speech. Clearly a matter of public concern in that discrimination issues are inherently matters of public concern. That was the context of Dr. Patterson's speech. As to the Title VII discrimination issues, particularly on pretext, my friend on the other side talked about Dr. Professor Cluel's testimony about her personal experience with Dr. Patterson's lack of collegiality. If you look deeper into the cross-examination of Professor Cluel, she acknowledged that she has no personal knowledge of anything that she's relied upon. It was some sort of game of one professor saying something to another professor about Dr. Patterson. It's all hearsay. She has no knowledge of any of it, but that's what she decided for herself was the basis for a lack of collegiality. Dr. Trogdon, who was mentioned, who is the most senior person on all these committees, who has presided over the transfers of all the comparators mentioned, he testified that he was disturbed by the committee's behavior during the first round of the consideration of Dr. Patterson's transfer request because, according to Dr. Trogdon, who would know, and this is a large question, a disputed fact, the committee didn't talk about any of the criteria that they're supposed to consider when making these transfer questions. They didn't talk about scholarship. They didn't talk about teaching. They didn't talk about service. The only issue that... Didn't they do it again then? They did do it again. He was satisfied with what happened, right? He was satisfied that issues of Dr. Patterson's transgender status didn't overtly come up in the meetings. He didn't testify that he observed that there was no issue of transgender issues raised by the committee members. They didn't overtly say that. In his mind, the decision was not based on that. But he also testified that they gave short shrift, even in the second vote, to anything having to do with the required and only criteria that the committees are supposed to consider. They manufactured this collegiality issue, which is so vacuous and vague as to be impossible to define, and Dr. Kuhl couldn't define it. She said it was brought up implicitly, somehow. That's what the committee understood, even though it was never actually mentioned. Trogdon says that's the only issue they considered. He disagrees with everything that Kuhl has to say about it. That is a massive question of material fact that their own employees raise. Same with Dr. Mazzi discussing the importance of being on the main campus because that's where publishing and other speaking opportunities arise for professors. Professors don't have the same prestige at the local campuses that they do on the main campuses. She emphasized that 80% of a professor's career is based on being at the main campus and publishing. She and Trogdon both agreed that service, even if they spoke about service at the votes, that is the most minor of considerations to make. The service commitments that Dr. Patterson resigned, they expressed to their colleagues, was because they were facing discrimination in the load reallocation and their application to move to the new school. They didn't just willy-nilly decide they were going to quit these assignments. They complained about the assignments to people in authority, like Dr. Gooden and the English coordinator at the Tuscarawas campus. The other professor I'm blanking on, her last name is also Patterson. They were the highest ranking person at the Tuscarawas campus. They did complain about discrimination to people in a position to make a decision. It's a question of fact, at least, as to whether or not Dr. Gooden discussed that with the dean. Dr. Gooden says in her affidavit that the dean said discrimination wasn't part of that, so it at least implies that the discrimination issue was reported up the ladder to the dean. I've run out of time. If your honors have any other questions. All right, thank you for your arguments. The case will be submitted.